May it please the Court, my name is Attorney Timothy Chagall. May it please the Court, my name is Timothy Chagall, and I represent the appellant Mark Galvin. I'd like to request two minutes for rebuttal. Yes. I'd like to argue today two reasons why the District Court's order granting summary judgment should be reversed. The first, the Court failed to apply the rebuttable presumption rule, and the second is the Court failed to apply the correct commercial reasonableness standard. First, Nevada has adopted Article 6, Section, or Article 9, Section 626 of the UCC, which contains a rebuttable presumption rule. Under this rule, there's a presumption that when a creditor comes to enforce an efficiency judgment, that that creditor has complied with the law. The law also provides that that presumption can be rebutted by raising an issue, and that's done by the defendant will raise an issue of fact for the Court to consider, and once that fact question is raised, the Court then shifts the burden of proof over to Harley-Davidson, in this case, to prove compliance with the law. And what's the material issue of fact here? Okay, sure. The key material issue of fact here is the airplane is repossessed. There's no dispute about that. It was vandalized after it was repossessed, and then it was sold, and the purchase and sales agreement said that at some future date, the vandalism would be repaired, and that's the facts. So the question is, what steps were done to market it while it was in a damaged condition, and did that fact that it was damaged dissuade other buyers that might dispute the aircraft sold for a low price? We believe that low price is because it was damaged and un-airworthy, could not fly, and that's why other buyers weren't interested. And so the standard that the Court should have applied is set out in Section 627, which is a long standard, but it's precise, so I'll read it. It says the sales should be in conformity with reasonable commercial practices among dealers, the type of property, and the subject of the disposition. So this is a two-part test. First, Harlan Davis had to prove what the standard was, and second, they had to provide facts showing they complied with that standard. I'm sorry, I didn't understand your answer to Judge Kayada. Yes, the were put back. But what is the issue of fact about the plane being damaged? The issue of fact is twofold. The first is what a reasonable dealer would have done to repair that plane and properly market it to get the best price possible, and what was actually done. Yes, but what is it the the record is silent on that point. The record doesn't explain. Oh, no, no, you're up here on summary judgment. The District Court found on undisputed facts that the dealer's actions were all commercially reasonable. You have to point out something that shows that the District Court was not justified in making the decision that it was commercially reasonable. What evidence did you put forward that it was not a commercially reasonable sale? Sure, there is evidence in the record that Mark Galvin contacted the dealer about buying the property and that they turned him away because it was not in a condition that was ready to be sold. So our argument is that a reasonable dealer would have repaired the airplane and then placed it up to be sold, and there was not proof that it was repaired before it was placed up for sale or advertised it would be repaired. Again, can you please get specific? What is it they didn't do? The dealer did not repair the aircraft prior to marketing it. Okay, it put back the radios. Correct, they put back the radios. Okay, are you saying it happened? I thought it didn't put them back. I thought that's your... So the sequence is... It didn't put them back till after it had sold. It sold it to an obligation. So there's an affidavit on the record from Mark Galvin that explains that he has extensive experience buying and selling aircraft. Yes, and the District Court found that, if you will, it's his self-serving affidavit. It did not provide any proof about commercial dealings. It was merely his opinion against proof that the sale was commercially reasonable. Right, and that's... But again, it isn't the radios. Did you think there was an obligation to repaint the airplane? No, that's not the argument we're making, Your Honor. The argument is that under the statute that controls, in this case, there's a rebuttable presumption that Harley-Davidson has to come forward and prove what the commercial reasonable standard is, and that the duty on Mark Galvin is only to raise the issue. That's the language in the statute. So we believe that he raised the issue. And by the issue, are you referring to whether they should have replaced the radios for selling the plane as opposed to telling buyers that they would fix the radios post-purchase? That's correct, Your Honor. So you're saying you raised that, and merely by raising it, they then had to put in evidence that it was commercially reasonable? Yes, Your Honor. If you look at Official Comment 3, Section 622, that Official Comment explains the process to be followed here, and that's the error we believe that the Court made. The Court looked for evidence, but... And there's a case on point that I can send a letter explaining this. But it wasn't his duty to prove the evidence. It was his duty to raise the issue so that the Court could analyze the evidence. And who has the burden of showing that even if that was commercially unreasonable, that it had an impact on the price realized for the sale of the plane? So Harley-Davidson has the burden of proving what the standard is and the compliance of that standard. So every deficiency judgment case will have arguments about price, just logically. There has to be something more. We agree to that. And the more in this case is that the aircraft was vandalized and it was not repaired. There's no evidence that it was advertised that it would be repaired as part of the sale. We just don't know the surrounding facts of what happened. We don't know how it was marketed, how it was sold, who it was listed to. Under 610, Article 9, Section 610, every aspect of the sale must be commercially reasonable. Do we know that it was marketed as having been vandalized? The record is silent on how it was marketed. There's no affidavit from the dealer on what they did at all. The affidavit that is in the record from the bank says the aircraft was sold. So if the bank has a burden of proving that it was sold reasonably, just a statement that it was sold gives no details. So we can pick and choose parts from a spotty record. There's insufficient here to prove that they complied with every aspect of the sale, which is their burden of proof. So for example, the court said there has to be a calculated effort. That's one of the cases they cited. So we look here and say where in the records are proof of a calculated effort to obtain a fair sale from Art Galvin? And the record is silent on that point. We know it was vandalized. We know it was repaired as part of the sale. But we don't know what calculated effort was taken to say how should a dealer fix a vandalism to make sure it's sold for a fair price? And that absence of proof, we believe, shows that Harley-Davidson failed to meet their burden of proof for summary judgment. Was, uh, Galvin is something of an expert in the area? He is. The suit's actually against an aircraft company. Wasn't he, um, kept apprised at what the potential price might be? That's correct. And he didn't complain? Uh, the record does, uh, sure. The record says that it's a price range of about... So why isn't that sufficient evidence to meet the burden that you say exists? Sure. Two points. One, you can't waive commercial reasonableness. That's part of the code. And second, there's no evidence that when he agreed to the sale, he agreed the dealer could take it, have it damaged, not fix it and sell it. Okay. Good morning, Your Honors. Mark Thompson of the Law Firm of Montgomery on behalf of the Plaintiff Appellee Harley-Davidson Credit Corp. Um, I think I'd like to focus on a couple of things here. Uh, first, um, the, Harley clearly demonstrated commercial reasonableness here. Um, it wasn't just simply that this was sold through a dealer. Um, even though that alone should be enough to, um, meet Harley's burden under the, uh, use of the city. The district court didn't rely on that and I don't think you should ask us to do that either. Thank you, Your Honor. Um, I, I think, well, I think the district court did indicate that, um. It's part of the. It's part of, it's at least one factor. Yes. Um, additionally, though, um, we have the fact that, and I think this is the, really the dispositive fact here, is Mr. Galvin agreed a year before the plane went on, on sale, a year before, a year before it was repossessed, a year before it was, it went on sale. He agreed to list it with this particular dealer, with this particular third party dealer. Um, not only did he agree to list it with this particular dealer, but he agreed to list it with this dealer with the understanding that he would only receive, that he probably would only get about $180,000 for it, which is only a little bit more than what was ultimately obtained. And even then, uh, it was with the understanding that, that $180,000 was only if the aircraft was in good condition. But of course the aircraft wasn't in good condition. The aircraft had paint issues, it had autopilot issues. Um, but what do you say about the, the specific argument I think I just heard, was that the radio was vandalized while in your client, after your client took possession. It was not prepared, repaired before the sale and it was sold with the radio missing, but with a promise to replace it. And then he says, he raised an issue as to whether that's the commercially reasonable way to sell a plane. And he says it's commercially reasonable to have repaired it first, so the buyer isn't thinking, eh, what happened to this plane? And then the linchpin of his argument is, having raised that issue, the burden was then on you to introduce evidence that it was commercially reasonable not to repair it first. That's the argument I hear. How do you respond to that? Yes, Your Honor. Um, I would respond to that by, by a couple of things. First of all, again, this was a third-party dealer. Um, you know, so, you're supposed to be able to, the whole, the UCC essentially lays out that creditors are- Let me, let me just stop you there. Take it a step at a time. Do you agree with what we're being told that once he made that argument that I just said, the burden was on you to then show that it was commercially reasonable to not repair the radios before the sale? Um, I think in general I would agree with that argument, Your Honor. So then what evidence did you put forward that it was commercially reasonable not to repair the radios before the sale? Um, well, I think, first of all, Your Honor, um, there's the fact that, again, this was sold through a dealer. So, uh, I don't see how the dealer's actions can be attributable necessarily to Harley-Davidson Credit Corp. Um, second of all is, and this is particularly true because the way the UCC is structured, it lays out that creditors are supposed to be able to, essentially, to trust dealers. Um, you know, Harley-Davidson Credit doesn't have, you know, the experience selling aircraft. Um, a dealer does. And if Harley-Davidson had tried to sell it itself, um, how would it respond to Mr. Gallagher's complaints? Well, it would go to a dealer and it would get an affidavit from a dealer saying that this is how the dealer would handle it. Um, and here we have a situation where that's exactly, you know, the dealer was the one who did it. So, um, you know, it doesn't make much sense in the UCC to require Harley-Davidson to go to yet another dealer and explain how the first dealer that it used, um, acted reasonably. Um, that's not a burden that the UCC puts on a creditor. In fact, that's, you know, the whole point of this requirement. So, I think you're back to where you started with Judge Lynch. I think what I hear you saying is that once you went and got a reputable commercial dealer, you had fully discharged any burden you had to show that the sale was reasonable. No matter what the dealer did. I think that's what I hear you saying. I think that's correct, Your Honor. But I would also add, um, that that's not the only thing we have here. We have the fact, and I think this should really be dispositive, is that ultimately when it was sold, the sale price was pretty much exactly what Mr. Gallagher had been told to expect before the vandalism. So that, I think, is very strong evidence. I thought he was told $185,000 was the bottom range. $180,000, Your Honor, and it was sold for $155,000, which is almost, I think, about 85-90% of what he was told to expect. So he wants to be off the hook for that difference, that 10-15%? No, Your Honor. Mr. Galvin wants to be off the hook for the entire deficiency. Um, Mr. Galvin has not said that he would be willing to accept just that discrepancy. However, Mr. Galvin wasn't just told that the $180,000 was the be-all and end-all. He was told to expect lower if the aircraft was in damaged condition. And not just, you know, and it was in damaged condition, as Mr. Galvin himself concedes. He doesn't dispute that it had a terrible paint, you know, that the paint was in trouble. He doesn't dispute that the autopilot wasn't working, et cetera, et cetera. You know, that's before we even get to the issue of the vandalism. Had the dealer seen the plane at the time you gave them the range that went down to $180,000, $185,000? I don't recall, Your Honor. But I don't think, again, I don't think it's necessarily material. Because, again, he made it very clear, you know, with an aircraft with this mileage, or sorry, with this amount of time on it, an aircraft with, you know, this make and model, this is what I would expect to get at a, you know, at a sale. Assuming that it's in good condition. And, of course, it wasn't. Additionally, Mr. Galvin is saying that the repairs were supposed to be made at some future date. That's not true. The repairs were supposed to be made before the closing on the aircraft sale. So it was very clear that those repairs were already incorporated into the price. You know, so I think that Mr. Galvin essentially left with speculation as to whether or not that would have improved the price that Harley-Davidson ultimately would have received here. Especially when you consider that on top of all that, another year had passed. And so, you know, aircraft depreciated, as the trial court noted. You know, so there's all sorts of factors here that more than adequately explain the, you know, very slight difference between what Mr. Galvin was told to expect. So you're saying that the radios were, in fact, installed by the date of the closing? Yes, Your Honor. Although they had not been installed as of the date the agreement is reached? That's correct, Your Honor. That's my understanding. Thank you. Is there any evidence that that's a commercially unreasonable practice? No, Your Honor. There's no evidence whatsoever that that's unreasonable. And, you know, frankly, I think it's hard to see how it would be unreasonable. You know, Mr. Galvin, I think, has asserted, well, you know, deprived potential buyers of the opportunity to test the aircraft. So was it marketed? Was it disclosed in the market? I assume it was marketed by the third-party dealer? Yes, Your Honor. And was it disclosed that there were repairs that were needed in that marketing effort? Do we know if any buyers were scared off? Is there anything in the record as to that? Your brother says there's nothing in the record. There's nothing in the record as to whether any buyers were scared off. And I don't know of anything in the record to suggest that it was marketed as having been vandalized. You know, so... What about the radios? Somehow this comes to the attention of the potential buyer. Somehow a deal gets worked out. We will fix it before the date of the actual closing. So by inference, somehow there was some disclosure of that problem. Correct, Your Honor, certainly. Right. You know, whether that was disclosed during the marketing or whether it was disclosed only during negotiations over the sale. Was there an inspection of the plane as part of the sale? I don't know, Your Honor. My assumption is that there almost certainly would have had to have been because certainly the purchaser would have had to determine if it was airworthy, you know, which is a function of FAA regulations. That's a standard part of these sales and is in fact required by government regulations. That would be my understanding, Your Honor. What do you say about his affidavit as a guy who's bought five planes and serviced them that someone who shows up and the first thing they see is that radios are missing because the plane has been vandalized is automatically going to say what's been happening to this plane and not pay as much for it? Well, Your Honor, I think that, first of all, it's a self-serving affidavit, so the court was correct. Affidavits aren't self-serving. I hope that, does that answer your question, Your Honor? No, it doesn't because your burden is still commercially reasonable. Okay, can I just have an extra few seconds to answer that question? Yes. Okay, I think the answer to that is simply, again, he agreed at the outset what the proper price was. I think once you have the price, you've established the price is reasonable, I don't see how you can realistically challenge the reasonableness of the sale. And with that, I respectfully request this court to uphold the trial court's decision. Thank you, Your Honor. All right, so I would direct the court's attention to the Kansas surplusage to say the statute is clear about what the requirements are in 627, which says the commercial reasonable standard to start with that. For the radio, I'd clarify that the transponder was missing as well, which is required by the FAA to take off. So when they did their inspections, they couldn't fly the plane, they couldn't take off, which again would limit their ability to negotiate a fair price. And that's really the point we're getting at, not what the end product was, but what the value was when they negotiated the price to sell the aircraft. And I believe the results will be different here, because again, under the statute, there's a process where the court can go back and determine what the impact was of this damage to the aircraft, and then adjust the deficiency judgment to take that into account. So the court can determine that, or the court can say no deficiency judgment, but that's a matter the court should handle on remand. So I'm happy to answer any further questions. I have interpreted a suggestion that was made earlier to mean that perhaps the possibility of settlement in the range between the deficiency and the price that was first quoted may still exist. I don't know whether that's true or not. I urge you to talk to your clients quickly. Our clerk's office will contact you to see if you want to take advantage or take another opportunity to take advantage of our mediation program before we do too much more work on this case. But you'll have to decide very quickly. So thank you.